# EXHIBIT A

| | |
|---|---|
| DISTRICT COURT, Denver County, Colorado<br>1473 Bannock Street<br>Denver, CO 80202 | DATE FILED: May 22, 2023 12:33 PM<br>FILING ID: C6D6A8F42A8A8<br>CASE NUMBER: 2023CV31495 |
| Plaintiffs: Leah Cross, Marco Granger-Rivera, and Ryan Schilling, and those similarly situated,<br><br>v.<br><br>Defendants: AMAZON.COM INC., and AMAZON LOGISTICS, INC. | ♦ COURT USE ONLY ♦ |
| Attorneys for Plaintiffs:<br><br>David H. Seligman, No. 49394<br>Valerie L. Collins, No. 57193<br>Alex Hood, No. 42775<br>Juno E. Turner<br>TOWARDS JUSTICE<br>303 E. 17th Ave. Suite 400<br>Denver, CO 80203<br>(720) 441-2236<br>david@towardsjustice.org<br>valerie@towardsjustice.org<br>alex@towardsjustice.org<br>juno@towardsjustice.org<br><br>Toby J. Marshall, *Pro Hac Vice Forthcoming*<br>Eric R. Nusser, *Pro Hac Vice Forthcoming*<br>TERRELL MARSHALL LAW GROUP, PLLC<br>936 North 34th Street, Suite 300<br>Seattle, Washington 98103<br>(206) 816-6603<br>tmarshall@terrellmarshall.com<br>eric@terrellmarshall.com<br><br>Shelby Leighton, *Pro Hac Vice Forthcoming*<br>David Muraskin, *Pro Hac Vice Forthcoming*<br>PUBLIC JUSTICE<br>1620 L St. NW, Suite 630<br>Washington, DC 20036<br>(202) 797-8600<br>sleighton@publicjustice.net<br>dmuraskin@publicjustice.net | Case No:<br><br>Courtroom: |

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Leah Cross, Marco Granger-Rivera, and Ryan Schilling ("Plaintiffs") by and through undersigned counsel, individually and on behalf of all others similarly situated, file this *Class Action Complaint* against Defendants Amazon.com Inc. and Amazon Logistics, Inc. (collectively, "Amazon") and allege as follows:

## STATEMENT OF THE CASE

1. This case is about one of the wealthiest and most powerful companies in the world, Amazon, maintaining work policies that require its delivery drivers in Colorado to urinate in bottles in the back of delivery vans, defecate in bags, and, in many cases, to restrain themselves from using the bathroom at risk of serious health consequences. Amazon operates this scheme through harsh work quotas and elaborate tracking and workplace surveillance technology that make it impossible for Amazon delivery drivers to fulfill basic human needs while on the job.

2. Amazon is a United States-based multinational corporation. The company's annual revenue in 2022 exceeded $500 billion, making it the second largest company in the world by revenue. Amazon is extraordinarily profitable, especially since the beginning of the COVID-19 pandemic. During the fourth quarter of 2021, Amazon reported its most profitable quarter ever—with $14.3 billion in profits.

3. According to Amazon's communications, the company "obsesses over how to make customers' lives better and easier every day." Core to that aim is its effort to deliver goods transported around the world to customers' homes and offices as quickly as possible—often within the same day or the next day.

4. For the majority of Amazon packages, the last leg of the delivery process, described in the logistics context as "last-mile delivery," is performed by a vast network of purportedly independent companies known as Delivery Service Partners ("DSPs") that contract directly with Amazon. Amazon contracts with more than 3,000 DSPs nationwide, all of which help Amazon manage more than 275,000 delivery workers.

5. DSPs are independent in name only. To be accepted into Amazon's DSP program, those interested in "launch[ing] and operat[ing] their own delivery business," as Amazon advertises, must acquiesce to Amazon's control over nearly every aspect of their business. Amazon sets the terms of each DSP's work through comprehensive non-negotiable contracts.

6. Amazon's contracts with each DSP dictate that the DSP must meet certain delivery quotas for the company.

2

7. The contracts also authorize Amazon to set delivery routes for DSPs, which each DSP must then require its drivers to complete according to schedules set by Amazon.

8. Amazon also closely monitors drivers' work through a comprehensive workplace surveillance scheme that includes GPS tracking and surveillance cameras inside delivery vehicles. This technology ensures that drivers deliver packages at the pace Amazon demands.

9. Amazon's extensive use of technology to control DSPs and their delivery drivers allows it to provide quick deliveries to millions of customers while minimizing the number of drivers it needs to employ to make those deliveries. But the demands Amazon imposes on these drivers come at stark human costs.

10. Amazon drivers are under so much pressure to meet their delivery goals that they do not even have time to go to the bathroom. Many drivers control how much water they drink to minimize the likelihood of having to urinate during their shifts. When they inevitably do need to use the bathroom, drivers urinate in plastic bottles and even defecate in dog waste bags in the back of their delivery vans to ensure that they do not face discipline for failing to stay on pace with their deliveries.

11. These human harms are a direct consequence of Amazon's pace-of-work policies, and Amazon and its DSPs are fully aware of those consequences. Supervisors of Amazon drivers instruct drivers to remove "pee bottles" from delivery vehicles. Managers also instruct drivers to urinate or defecate outside the range of the surveillance cameras that Amazon uses in its vehicles to monitor delivery drivers. And trash cans in Amazon fulfillment centers, which house DSPs, are frequently overflowing with bottles full of urine that drivers have thrown away at the end of their shifts.

12. Amazon's brutal and inhumane conditions violate drivers' statutory rights in several ways. First, Colorado law requires employers to provide all workers with paid rest breaks for every four hours of work. Amazon systemically violates these laws by routinely requiring drivers to work through their rest breaks if they are to meet their delivery metrics and not paying Amazon drivers for missed breaks. Amazon's policies and practices violate, among other things, the Colorado Wage Claim Act, § 8-4-101, *et seq.* (the "Wage Claim Act") and the Colorado Minimum Wage Act, C.R.S. § 8-6-101, *et seq.*, as implemented by the Colorado Minimum Wage Order or the Colorado Overtime and Minimum Pay Standards Order (the "Minimum Wage Act"). Plaintiffs bring this class action on behalf of all current and former DSP drivers in Colorado and seek unpaid wages, penalties, and a change in Amazon's policies.

13. Second, Amazon's policies discriminate on the basis of sex in violation of the Colorado Anti-Discrimination Act ("CADA"). Amazon's pace-of-work policies and control, maintained through extensive surveillance, violate civil rights laws that guarantee equal treatment in the workplace because Amazon fails to provide its drivers with reasonable access to

3

bathrooms, which has an illegal disparate impact on people with typical female anatomy.[1] Plaintiff Leah Cross asserts that claim on her own behalf and on behalf of a class of all other current and former DSP drivers in Colorado with typical female anatomy.

14. Plaintiffs assert these claims to seek damages and injunctive relief to force Amazon to comply with the law and allow their drivers the dignity of being able to meet their basic human needs.

**PARTIES, JURISDICTION, AND VENUE**

15. Defendant Amazon.com Inc. is a Delaware corporation with its principal place of business in the State of Washington. At all times relevant to this complaint, Defendant Amazon.com Inc. was registered with the Colorado Secretary of State to do business in Colorado and, in fact, did do business in Colorado.

16. Defendant Amazon Logistics, Inc. is a Delaware corporation with its principal place of business in the State of Washington. At all times relevant to this complaint, Defendant Amazon Logistics, Inc. was registered with the Colorado Secretary of State to do business in Colorado and, in fact, did do business in Colorado.

17. Plaintiff Leah Cross, an individual and resident of the State of Colorado, worked as an Amazon delivery driver in Colorado from August 2022 through November 2022.

18. Plaintiff Marco Granger-Rivera, an individual and resident of the State of Colorado, has worked as an Amazon delivery driver in Colorado since 2019.

19. Plaintiff Ryan Schilling, an individual and resident of the State of Colorado has worked as an Amazon delivery driver in Colorado since August 2022. Since December 22, 2022, Plaintiff Schilling has been on medical leave as a result of an on-the-job injury.

20. Venue in this Court is proper pursuant to C.R.C.P. 98 because Amazon may be found in Denver County.

21. This Court has jurisdiction over the parties and subject matter of this action pursuant to C.R.S. § 13-1-124 and the Colorado Constitution.

22. Plaintiff Cross filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD") against Amazon on May 22, 2023, alleging discrimination on the basis of sex in violation of the Colorado Anti-Discrimination Act. Plaintiff Cross has not yet received a Notice of Right to Sue from CCRD but will amend this Complaint to reflect administrative exhaustion of her Colorado Anti-Discrimination Act claim as soon as notice is received.

---

[1] For the purpose of this complaint, "typical female anatomy" includes anatomical characteristics typically assigned female, such as internal urethras.

4

**Amazon's Employment of Delivery Drivers**

23. Through the operation of the Amazon.com website (www.amazon.com), Amazon is a commercial seller of electronic and consumer goods and provides delivery of its various products to its customers' designated addresses.

24. Amazon delivers the goods by using local transposition and logistic companies known as "Delivery Service Partners" or DSPs.

25. DSPs effectively serve as Amazon's agents to facilitate deliveries. New DSP owners need no prior logistics experience because Amazon equips DSPs with everything they need to become operational as Amazon's last-mile delivery providers.

26. After completing the application process, a DSP owner can lease or own between 20 and 40 Amazon-branded vans through an Amazon partner.

27. The DSPs are functionally, and often solely, dependent on payments made by Amazon to make regularly scheduled payroll to Plaintiffs and similarly situated delivery drivers.

28. To streamline its delivery operations, Amazon provides access to Value-Added Services ("VAS"), which it has arranged with third-party vendors that have agreed to offer goods and services to enable DSPs to perform deliveries. For example, VAS programs may include vehicle leasing, insurance, fuel cards, mobile devices, and uniforms.

29. To ensure DSPs follow Amazon's procedures, Amazon directs DSPs through a centralized online portal, where Amazon provides real time updates of its delivery needs and requirements. Amazon DSPs face termination from the DSP program if they are unable to satisfy Amazon's requirements—including, for example, if Amazon drivers do not meet the delivery requirements set by Amazon.

30. Amazon recruits delivery drivers and, after culling applicants, passes applicant information to local DSPs, which conduct in-person interviews. Amazon designs and provides driver safety training for new hires and often combines new hires from multiple DSPs in the same training.

31. Once hired, Amazon exercises control over Amazon delivery drivers by, among other things, (1) requiring drivers to arrive at an Amazon distribution center each work day, where Amazon drivers pick up packages, (2) requiring drivers to load packages into Amazon-branded vans, (3) requiring drivers to scan all packages on Amazon devices, (4) requiring drivers to deliver packages within certain specified timeframes set by Amazon, and (5) requiring drivers to perform work duties while wearing Amazon-branded uniforms.

32. Amazon uses sophisticated GPS driver tracking technology, algorithms, and dispatch services, which together operate to control and surveil drivers to ensure that they meet Amazon's requirements for delivering packages within certain Amazon-imposed timeframes.

33. For example, drivers must follow Amazon's instructions regarding where to make deliveries, in what order, and what route to take. If a DSP's drivers fail to follow Amazon's instructions, the DSP is subject to termination from Amazon's DSP program.

34. Amazon also requires drivers to follow strict rules governing everything from their interactions with customers to how quickly they must scan packages before deliveries and when completing deliveries at a customer location. Amazon also evaluates drivers on the photos they take after a package has been delivered.

35. Amazon also requires DSPs to provide Amazon with data collected on delivery drivers, such as tracking data, which includes location, movements, speed of travel, and personally identifiable personnel information. Amazon uses this data to evaluate driver performance, and DSPs warn delivery drivers that Amazon can fire them for failing to meet Amazon's standards.

**Work by Plaintiffs and Those Similarly Situated in Amazon's DSP Program**

36. Plaintiffs all delivered Amazon packages to Amazon customers in Colorado.

37. The Amazon packages transported and delivered by Plaintiffs and Amazon delivery drivers in Colorado travel through interstate commerce. Those packages remain in the stream of interstate commerce until their delivery by Plaintiffs and other last-mile delivery drivers to the doors of Colorado consumers. Those packages traveled on airplanes or trucks across state lines to reach Amazon facilities, where Amazon delivery drivers retrieved them and brought them to Amazon's Colorado customers.

38. At the beginning of a shift, all delivery drivers in Colorado, including Plaintiffs, arrive at their designated DSP location and receive their Amazon-assigned daily routes. Drivers then have a limited amount of time to load up the delivery van assigned to them with their daily packages.

39. After drivers leave the loading facility, they communicate with DSP dispatch through an app, where dispatch forwards messages from Amazon to drivers to direct their work. Some drivers use hand-held scanning devices to record deliveries, other drivers use cell phones provided by the DSP, and others use personal cell phones. Regardless of the kind of device they use, Amazon not only assigns drivers their delivery locations but also dictates the specific routes drivers must take, even if traffic conditions on that route are bad.

40. In addition to tracking their locations, Amazon monitors Amazon drivers inside the delivery vehicle using artificial-intelligence-powered surveillance cameras. The cameras monitor drivers' facial movements, ostensibly to ensure that they are not distracted, by checking to see if drivers are looking at their phones or engaging in any conduct that may indicate a safety concern, such as frequent yawning due to fatigue.

41. Amazon also uses video surveillance to monitor Amazon drivers' driving,

6

including how long they stop at stop signs, vehicle placement within traffic lanes, and the distance between the delivery vehicle and other vehicles.

42. Amazon's video surveillance of Amazon delivery drivers functionally impedes drivers from doing anything in the vehicles except delivering Amazon's packages, and only Amazon's packages, in the way that Amazon requires.

**Amazon Does Not Pay Amazon Drivers for Missed 10-Minute Breaks Required Under Colorado Law**

43. At all times relevant to this Complaint, Amazon has intentionally and willfully implemented a policy whereby drivers, including Plaintiffs, are unable to take duty-free paid rest breaks, as required by Colorado law, and are then not paid for those missed rest breaks. Amazon has enforced this policy by imposing delivery standards and quotas that are virtually impossible to achieve if Amazon Drivers pause their work for more than a few minutes during their shifts.

44. Amazon requires Amazon delivery drivers to deliver hundreds of packages a day within specified timeframes. Amazon also has no functional system in place to relieve delivery drivers during busy periods to ensure that they can take breaks.

45. For delivery drivers like Plaintiffs, the consequences of failing to deliver packages on time are dire. Any undelivered or late package is a negative demarcation on a driver's "scorecard," which is used to track the driver's delivery rates and driving data as collected by Amazon's surveillance technology.

46. Delivery drivers, including Plaintiffs, are aware that Amazon tracks not only package deliveries but also the whereabouts of drivers at all times. If a delivery vehicle is stationary for more than five minutes, drivers often receive a phone call from their DSP dispatch. As a result, on the few occasions when drivers attempt to take a break, they receive a call from their DSP urging them to continue their route so that Amazon's specified timeframes are met.

47. Amazon also actively discourages breaks through incentive-based pay that rewards drivers who work especially quickly. For example, the top ten drivers at Plaintiff Schilling's DSP would be awarded a $100 weekly bonus based on driving pattern data collected by Amazon, including delivery rates and driving scores.

48. Plaintiff Schilling routinely was responsible for 170-200 stops a day. Amazon instructed its drivers that each stop should not take more than 2-5 minutes, regardless of practical complications such as the stop being located in a building or gated community that required security access. As a result, if Plaintiff Schilling took a ten-minute rest break, it could put him as many as five stops behind his delivery goal.

49. Because of Amazon's delivery demands, supervisors at Plaintiff Schilling's DSP told him and other drivers that they should avoid taking breaks because if they paused the delivery schedule dictated by Amazon, they would not make it back to the Amazon warehouse

7

by the end of their shift, which would result in a negative scorecard rating.

50. On the occasions when Plaintiff Schilling fell behind on his deliveries, he received texts from dispatch explaining how many stops behind he was and urging him to speed up to meet Amazon's delivery goals. Even when Plaintiff Schilling tried on a handful of occasions to take a rest break, the break did not amount to 10 minutes. Plaintiff Schilling was not paid for these missed rest breaks.

51. Plaintiff Granger-Rivera has had the same experience. He and other drivers for his DSP have understood that it is virtually impossible to take duty-free rest breaks while also meeting Amazon's delivery requirements.

52. During stand-up meetings with his DSP, Plaintiff Granger-Rivera's supervisors have explained that drivers who did not meet delivery goals or spent too long between deliveries would be audited and terminated.

53. As a direct result of these policies, Plaintiff Granger-Rivera has rarely taken a rest break of even a few minutes during his time working as an Amazon delivery driver. Even when Plaintiff Granger-Rivera has tried on a handful of occasions to take a rest break, the break did not amount to 10 minutes. Plaintiff Granger-Rivera has not been paid for these missed rest breaks.

54. Plaintiff Cross had the same experience. She was never able to take 10 uninterrupted minutes of break time. She was not even able to take uninterrupted, continuous breaks of five minutes. The pace of work and frequent surveillance by Amazon prevented her from going off course or from pausing for longer than a few minutes at a time.

55. Even when Plaintiff Cross did stop for a few minutes, she would use the time to rearrange packages in the van in order to be able to deliver upcoming packages as quickly as possible. If she did not use her time in this way when the vehicle was stopped, she would fall even further behind in her deliveries.

56. As a consequence of Amazon's policies, Plaintiffs and other drivers were consistently denied the 10-minute duty-free rest breaks required by Colorado law.

57. Amazon failed to compensate Plaintiffs and other drivers for any of these missed rest breaks.

**The Inhumane Consequences of Amazon's Policies**

58. Amazon's work quotas and extensive workplace surveillance cause devastating human costs to delivery drivers who, as a condition of maintaining their livelihoods working for the company, are forced to suffer degrading experiences like urinating in bottles, defecating in the back of delivery vehicles, or holding their urine to the point of risking harm to their health, including urinary tract infections.

8

59. The harm that Amazon's policies cause drivers are well known to Amazon, DSPs, and drivers.

60. Near where Amazon delivery drivers finish their delivery shifts, trash cans are full of urine-filled bottles, as are trash cans at gas stations located near Amazon facilities.

61. Amazon delivery vans frequently smell of urine because bottles full of urine often spill on the floor of the vehicle.

62. Frequently, supervisors instruct drivers—both in person and via Amazon's communication apps—to remove "pee bottles" from their delivery vehicles.

63. Plaintiff Schilling is a veteran of the Iraq War, who, during his service, had to work under difficult conditions that prevented him from accessing the bathroom. But he often found it more difficult to find time to take care of his basic human needs while working as an Amazon DSP driver in Colorado than he did while serving in active combat for the U.S. military.

64. To maintain his delivery schedule and avoid being reprimanded, Plaintiff Schilling urinated quickly in bottles in his Amazon-branded delivery van. On a few occasions, he had the overwhelming urge to defecate and felt that he could not hold it until the end of his shift. Knowing that he would be punished if he slowed or went off course to access a bathroom, he defecated in the back of his vehicle in a dog-waste bag.

65. Plaintiff Granger-Rivera also has urinated in bottles every day during his work as an Amazon DSP driver. Doing so has been the only way for him to meet his delivery quotas and avoid being reprimanded for falling behind.

66. On a few occasions, while racing to perform deliveries and without easy access to a bottle or the ability to stop for long enough even to urinate in his van, Plaintiff Granger-Rivera has been on the verge of urinating and defecating in his pants.

67. Because she has typical female anatomy, Plaintiff Cross experienced distinct harms during her work for Amazon. As soon as she showed up on the job, she learned that many drivers with male anatomy used bottles to urinate during their shifts and that there was little or no opportunity to use the bathroom during a shift while also meeting Amazon's delivery quotas.

68. Plaintiff Cross understood through conversations with other drivers and supervisors that, to work as an Amazon DSP driver, she would need to find ways to urinate in bottles or somehow avoid using the bathroom altogether during her shifts.

69. But because she has typical female anatomy, Plaintiff Cross could not urinate in a bottle in the van between stops, and she could not last for five hours or more without using the bathroom, even when she tried to limit her liquid intake.

70. When Plaintiff Cross began delivering for Amazon, she tried to find restrooms

along her route. But she quickly learned this was prohibited. She began receiving calls telling her that she was off course. Supervisors frequently asked, "Where are you?" or "Are you lost?"

71. On one occasion, Plaintiff Cross called dispatch to explain that she needed to find a bathroom that had female sanitary products. Although she had previously identified another bathroom along her route, she knew that it did not have sanitary products available. Her supervisors admonished her and told her not to break her route.

72. During one conversation with a DSP supervisor about how Plaintiff Cross could possibly meet delivery quotas while also meeting basic human needs, the supervisor told Plaintiff Cross that she should buy a female urination device called a "Shewee," which would allow her to funnel her urine into bottles so that she could urinate without having to leave the delivery van.

73. The same supervisor also warned Plaintiff Cross, however, that if she were to urinate in the van, she should close the door separating the van's cockpit from the cargo so that Amazon's surveillance cameras would not record her urinating. This meant that even with a Shewee, urinating was more difficult and time consuming.

74. After this conversation, Plaintiff Cross always brought a small bag to work that contained a female urination device, toilet paper, sanitary products, and waste disposal bags. She also brought a change of clothing in case she was unable to urinate into a bottle and had an accident in her pants because, even with the Shewee, urinating in a bottle was challenging.

75. Because of these challenges, Plaintiff Cross had difficulty delivering packages quickly enough for Amazon's liking. After several months working for Amazon, she was terminated for failing to meet Amazon's delivery quotas.

## CLASS ACTION ALLEGATIONS

76. This is a C.R.C.P. 23 class action on behalf of Plaintiffs and two Classes for which Plaintiffs seek certification. Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the Classes as follows:

### Rest Break Class
**ALL EMPLOYEES WHO DELIVERED PACKAGES FOR AMAZON AS DSP DRIVERS IN COLORADO FROM SIX YEARS PRIOR TO THE FILING OF THIS LAWSUIT THROUGH FINAL JUDGMENT.**

### Disparate Impact Class
**ALL EMPLOYEES WHO HAVE TYPICAL FEMALE ANATOMY AND DELIVERED PACKAGES FOR AMAZON AS DSP DRIVERS IN COLORADO.**

77. This action is properly brought as a class action for the following reasons:

10

  a. The Classes are so numerous that joinder of all Class Members is impracticable.

  b. Numerous questions of law and fact regarding Amazon's liability are common to the Classes and predominate over any individual issues which may exist.

  c. Although the exact amount of damages may vary among Class Members, the damages for the Class Members can be calculated by a simple formula or other means. The claims of all Class Members arise from a common nucleus of facts. Liability is based on a systematic course of wrongful conduct by Amazon that caused harm to all Class Members.

  d. The claims asserted by Plaintiffs are typical of the claims of Class Members and the Classes are readily ascertainable from Amazon's records. Plaintiffs were subjected to the same rules and policies as all other workers that form the basis of the alleged violation. Amazon applied its policies to Plaintiffs just as it did with all Class Members.

  e. Plaintiffs will fairly and adequately protect the interests of Class Members. The interests of Class Members are coincident with, and not antagonistic to, those of Plaintiffs. Plaintiffs are committed to this action and have no conflict with the Class Members. Furthermore, Plaintiffs are represented by experienced class action counsel.

  f. Questions of fact common to Class Members predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## **FIRST CLAIM FOR RELIEF**

**(Colorado Wage Claim Act, C.R.S. §§ 8-4-101, *et seq*.)**

**By Plaintiffs on Behalf of the Rest Break Class**

78. Plaintiffs incorporate by reference all paragraphs above.

79. At all material times, Amazon has been an "employer" within the meaning of the Colorado Wage Claim Act, C.R.S. §§ 8-4-101, *et seq*.

80. At all material times, Amazon has employed "employees," including Plaintiffs and Class Members, within the meaning of the Colorado Wage Claim Act, C.R.S. §§ 8-4-101, *et seq*.

81. As a result of the foregoing conduct, as alleged, Amazon has failed to pay wages due, thereby violating, and continuing to violate, the Colorado Wage Claim Act. These violations

have been and continue to be committed knowingly, willfully, and with reckless disregard of applicable law.

82. As a result, Plaintiffs have been damaged in an amount to be determined at trial.

83. Plaintiffs and the Class Members are entitled to all unpaid wages under various provisions of the statute, *e.g.*, C.R.S. §§ 8-4-103, -109, -110, as well as other compensatory damages, including damages for emotional distress, and penalties.

84. Plaintiffs and the Class Members are also entitled to attorneys' fees, costs, statutory interest, and all other relief deemed appropriate by the Court.

### SECOND CLAIM FOR RELIEF

### (Colorado Minimum Wage Act, C.R.S. §§ 8-6-101, *et seq*.)

### By Plaintiffs on Behalf of the Rest Break Class

85. Plaintiffs incorporate by reference all paragraphs above.

86. At all material times, Amazon has been an "employer" within the meaning of the Colorado Minimum Wage Act.

87. At all material times, Amazon employed, and continues to employ, "employees," including Plaintiff and Class Members, within the meaning of the Colorado Minimum Wage Act.

88. As a result of the foregoing conduct, as alleged, Amazon has violated, and continues to violate, the Colorado Minimum Wage Act. These violations have been committed knowingly, willfully, and with reckless disregard of applicable law.

89. As a result, Plaintiff and Class Members have been damaged in an amount to be determined at trial, including unpaid minimum wages and overtime.

90. Plaintiff and the Class Members are also entitled to attorneys' fees, costs, statutory interest, and all other relief deemed appropriate by the Court.

### THIRD CLAIM FOR RELIEF

### (Civil Theft, C.R.S. § 18-4-405)

### By Plaintiffs on Behalf of the Rest Break Class

91. Plaintiffs incorporate by reference all paragraphs above.

92. At all material times, Amazon has been an "employer" within the meaning of the Colorado Minimum Wage Act.

93. At all material times, Amazon employed, and continues to employ, "employees," including Plaintiffs and Class Members, within the meaning of the Colorado Minimum Wage Act.

94. Plaintiffs and Class Members are or were employees of Amazon within the meaning of the Colorado Minimum Wage Act.

95. Amazon has known it has failed to pay Plaintiffs and Class Members minimum wage because Amazon has known it has failed to provide breaks and has failed to compensate Plaintiffs and Class Members *at all* for these missed breaks.

96. Amazon's knowing failure to pay minimum wage under the Colorado Minimum Wage Act constitutes theft pursuant to C.R.S. § 18-4-401. *See* C.R.S. § 8-6-116.

97. As a result, Amazon's failure to pay minimum wage constitutes civil theft pursuant to C.R.S. § 18-4-405.

98. Plaintiffs and Class Members are entitled to treble damages and attorneys' fees to be determined at trial.

99. Plaintiffs and Class Members are also entitled to costs, statutory interest, and all other relief deemed appropriate by the Court.

**FOURTH CLAIM FOR RELIEF**

**(Colorado Anti-Discrimination Act, C.R.S. § 24-34-401 *et seq.*)**

**By Plaintiff Cross on Behalf of the Disparate Impact Class**

100. Plaintiffs incorporate by reference all paragraphs above.

101. At all material times, Amazon has been an "employer" under the Colorado Anti-Discrimination Act ("CADA").

102. At all material times, Amazon employed, and continues to employ, "employees," including Plaintiff Cross and Disparate Impact Class Members, within the meaning of CADA.

103. Plaintiff Cross has typical female anatomy and is part of a protected class under CADA. For the purpose of this case, that class includes people with anatomical characteristics typically assigned female, such as internal urethras.

104. Amazon's policies and practices caused a disparate impact on Plaintiff Cross and members of the Disparate Impact Class.

105. Amazon maintains a policy in Colorado of denying Amazon delivery drivers reasonable access to the bathroom during their shifts.

13

106. For drivers with male anatomy, this results in the daily indignity of urinating in bottles in their vehicle.

107. But Amazon delivery drivers with typical female anatomy, who cannot easily urinate in bottles and who are more likely to need access to bathrooms to take care of menstruation needs, suffer disproportionately from Amazon's policies.

108. Some, like Plaintiff Cross, may have to purchase additional equipment to urinate into bottles during work. Others suffer from urinary tract infections or do not intake liquids to avoid the need to urinate. Others are reprimanded from leaving their delivery routes to access the bathroom. Many Amazon drivers like Plaintiff Cross are terminated for failing to meet Amazon's delivery metrics resulting from Amazon's policies of denying them the opportunity to have reasonable access to the bathroom while also satisfying Amazon's quotas.

109. Amazon has no legitimate business justification for the policies that cause this harm.

110. One or more alternate practices without a significant disparate impact would equally have met Amazon's business needs.

111. Alternate practices include allowing more frequent rest breaks, not admonishing drivers for leaving their routes to access bathrooms when reasonably necessary, or hiring additional drivers to allow pace-of-work policies that permit drivers to have reasonable access to the bathroom.

112. Amazon's actions were intentional and taken with malice and with reckless indifference to Plaintiff Cross and the Disparate Impact Class's rights.

113. As a direct and proximate cause of Amazon's discriminatory actions and conduct, Plaintiffs will continue to suffer compensatory damages in an amount to be determined at trial, and punitive damages in an amount to be determined at trial.

114. Plaintiff Cross is in the process of administratively exhausting a claim for discriminatory or unfair employment practices pursuant to C.R.S. § 24-34-401 *et seq.* and will amend to add such a claim following the administrative exhaustion.

## **JURY DEMAND**

115. Plaintiff demands a trial by jury as to all issues so triable.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Amazon as follows:

1. Determining that the action is properly maintained

14

as a class action, certifying Plaintiffs as the class representatives, appointing Plaintiffs' counsel as counsel for Class Members;

2. Ordering prompt notice of this litigation to all potential Class Members;

3. Awarding Plaintiffs and Class Members their lost wages, compensatory damages, punitive damages, available penalties, attorneys' fees, and litigation expenses as provided by law;

4. Awarding Plaintiffs and Class Members their pre-judgment, post-judgment, and moratory interest as provided by law;

6. Awarding Plaintiffs and Class Members statutory penalties as provided by law; and

7. Awarding Plaintiffs and Class Members such other and further relief as the Court deems just and proper;

8. Determining that all claims in this Complaint are in good faith and not frivolous and are filed for the purpose of extending, limiting, modifying, or reversing existing precedent, law, or regulation, including the laws and regulations that serve as the basis for the claims alleged herein, or for the purpose of establishing the meaning of the laws that serve as the basis for the claims alleged herein.

Respectfully submitted this 22nd day of May, 2023.

/s/*Valerie L. Collins*

David H. Seligman, No. 49394
Valerie L. Collins, No. 57193
Alex Hood, No. 42775
Juno E. Turner
TOWARDS JUSTICE
303 E. 17th Ave. Suite 400
Denver, CO 80203
(720) 441-2236
david@towardsjustice.org
valerie@towardsjustice.org
alex@towardsjustice.org

15

juno@towardsjustice.org

Toby J. Marshall, *Pro Hac Vice Forthcoming*
Eric R. Nusser, *Pro Hac Vice Forthcoming*
TERRELL MARSHALL LAW GROUP, PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
(206) 816-6603
tmarshall@terrellmarshall.com
eric@terrellmarshall.com

Shelby Leighton, *Pro Hac Vice Forthcoming*
David Muraskin, *Pro Hac Vice Forthcoming*
PUBLIC JUSTICE
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
sleighton@publicjustice.net
dmuraskin@publicjustice.net


Counsel for Plaintiffs